COMMONWEALTH *vs.* MELVILLE A. PRATT, JR.

Essex.   December 6, 1971. — January 3, 1972.

Present: TAURO, C.J., CUTTER, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Evidence,* Admissions and confessions. *Constitutional Law,* Admissions and confessions. *Waiver. Practice, Criminal,* Report, Waiver, Capital case.

On a report of a criminal case under G. L. c. 278, § 30, this court treated the case as though it had been brought before it by appeal under §§ 33A–33G. |712|

Where it appeared that the defendant in a criminal case was not denied access to friends, family, and counsel, that his questioning by police took place over several hours, that his own testimony showed he was an intelligent, mature combat veteran, that there was no suggestion or trace of fear or fetter in his account, a finding was warranted that a confession made by him was voluntary, even though he was not officially warned of his right to remain silent. |712–714|

There was no error at a murder trial in not submitting to the jury the issue whether a confession by the defendant was voluntary where the record showed that after a voir dire and a ruling by the judge that the confession was voluntary the defendant was content with the ruling and waived submission of the issue to the jury. |714–715|

No reason appeared on the record of a murder trial for this court under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree to one of murder in the second degree or voluntary manslaughter. |715|

INDICTMENT found and returned in the Superior Court on September 14, 1962.

Following the proceedings described in the opinion, the case was reported by *Forte, J.*

*Reuben Goodman* for the defendant.

*John J. Jennings,* Assistant District Attorney, for the Commonwealth.

BRAUCHER, J.   The defendant was found guilty of first degree murder on November 23, 1963, after a trial under G. L. c. 278, §§ 33A–33G, and was sentenced to life imprisonment.   His motion for new trial and a claim of ap-

peal were filed on November 27, 1963. The motion for new trial was denied on December 10, 1963, and the defendant claimed an exception and an appeal on December 12, 1963.

Contrary to the defendant's instructions, his assigned counsel failed to perfect the appeal, and his right to appeal was lost through no fault of his. He sought to obtain review through successive writs of error. A single justice of this court, after a hearing on the merits of the third writ of error, suggested that counsel should seek a report of the case from the trial judge. The case is now before us on such a report, finding the facts stated above, and transmitting to us a record including a transcript of the evidence at the trial and of the hearing on the motion for new trial.

The defendant now argues several alleged errors with respect to his confession, and argues that we should direct the entry of a verdict of a lesser degree of guilt pursuant to G. L. c. 278, § 33E.

We summarize the evidence. The defendant and the victim met in the victim's coffee shop in Newbury on May 20, 1962, and left together between 5 and 6 P.M. They proceeded to a pizza place, a lobster pool, and a drinking place, all on Plum Island. About 10 P.M. the defendant called an employee of the victim at the coffee shop and said he had just shot the victim, that the victim was dead, that he had called his father, and that he was going to the Topsfield barracks of the State police. At 10:05 P.M. the defendant appeared at the Topsfield barracks and said to the officer at the desk, "I just killed a man." He also said that he must have fired the whole clip (eight cartridges). He then produced the gun, and said, "He is out in the car now," and "I must be crazy." A second police officer promptly looked in the car and found the body of the victim. A doctor was summoned and pronounced the victim dead, and an autopsy the next morning disclosed wounds made by seven bullets from the gun. The gun was semiautomatic; to fire eight shots took eight separate pulls on the trigger of five to five and one-half pounds pressure.

On voir dire examination out of the presence of the jury, the second police officer testified that he questioned the defendant from 10:25 to 10:50 P.M., that he then informed the defendant that he had a right to use the telephone, and that the defendant said, "I've already called my father." The officer said, "Would you like to call an attorney? I'll help you call an attorney." The defendant said, "No, I'd rather not talk to anyone." The defendant's oral statements were reduced to writing by the officer at 12:45 A.M. The first statement was not signed by the defendant, but a later statement was. The defendant was formally arrested and charged with murder about 5:30 A.M.

On the same voir dire, the defendant testified that the conversation about the telephone and calling a lawyer took place about 4 or 5 A.M. He also testified that he drove voluntarily to the police barracks, voluntarily made statements to the officer at the desk, and voluntarily made statements to the second police officer, that no threats or promises were made to him, that he was not abused, that everything he said was said voluntarily, but that he signed a statement because a police officer "told me I might as well sign the statements because the troopers are going to testify to it, anyway." He also testified that he was confused, nervous and upset, that the statement he signed was not completely accurate, and that he "just signed it to be cooperative." There was a first statement and he read it over; for personal reasons he did not want certain things in it, and he had them type it over again.

After the voir dire, the judge ruled that the second police officer was under no duty to advise the defendant that he need not answer any question or supply any incriminating evidence, and found that the defendant was not advised that anything that might be said might be used against him. The judge also found that, having made a statement, the defendant objected to it because there was something in it he did not like, and was told that the officers were going to testify to the statement; as a result a new written statement was made, and the defendant signed it. On the

basis of the defendant's testimony, the judge ruled that
any confession he made was voluntary. He also found on
the basis of the police officer's testimony that the de-
fendant was permitted to use the telephone in accordance
with G. L. c. 276, § 33A, as amended through St. 1960,
c. 269, and that he was informed of this right within the
first half hour of the time that he walked into the barracks.

Thereafter two police officers testified before the jury to
statements made by the defendant, and his signed state-
ment was read to the jury. The defendant also testified in
his own behalf as to the events of May 20 and 21, 1962, in-
cluding what he had said to the police. Although there
were some discrepancies, his testimony was basically in ac-
cord with that of the police officers and with his signed
statement. The defendant was thirty-one years old at the
time of the murder. After starting his third year of high
school, when he was seventeen, he enlisted in the Marine
Corps and served for ten years, until January, 1958. He
served in battle in Korea, qualified in every type of in-
fantry weapon, and instructed other marines in the use of
firearms. After leaving the Marine Corps, he worked on
his father's farm in Newbury. The victim was a man about
twenty-eight years old.

According to both the defendant's testimony and his
statements to the police, as he was leaving Plum Island
as a passenger in the victim's car on the evening of May 20,
1962, they had a heated argument about a girl. Thereafter
they went to the defendant's home, and visited briefly with
the defendant's parents. The defendant's mother fixed the
time as between 9 and 9:30 P.M. The defendant got some
money, a gun the victim had inquired about at an earlier
time, and a clip with eight shots for the gun. They got
into the car and drove down the driveway, about four or
five hundred feet long. There was further discussion about
the girl, and the defendant placed the clip in the gun and
shot the victim several times. The defendant got out of
the car, got into the driver s seat, drove to various places,
telephoned his father, and finally drove to the police bar-
racks.

At the trial the defendant testified to many details not included in his oral and written statements to the police. In his statement to the police he referred to beer consumed by him on Plum Island; in his testimony he added drinks from the victim's pint bottle on the way to Plum Island and again while at Plum Island, but he testified that he was not intoxicated. One of the police officers asked the defendant whether either he or the victim was a homosexual, and the defendant said "No" as to each. At the trial, however, the defendant testified to a homosexual assault by the victim immediately before the shooting and to an attempt by the victim to strike the defendant after the first shots.

The police testimony and the defendant's testimony agreed generally as to the sequence of events after the defendant went to the police barracks. After his initial interrogation, he told the same general story to other police officers. About 1:30 A.M. he left the barracks to show the different places to a detective and a district attorney. Before he left, he struck out most of a typed statement and refused to sign it. When he returned about 2:45 A.M. a second statement had been typed, and he signed it.

1. It is unnecessary to consider any default of the defendant's counsel with respect to his appeal. The case is before us on a report pursuant to G. L. c. 278, § 30. The purpose of this procedure is to afford the defendant as full a review as could have been obtained if his counsel had properly filed an assignment of errors after notice of the completion of the summary of record. See G. L. c. 278, §§ 33C, 33D. Accordingly, we treat the case as if it had been properly brought to us on appeal. *Commonwealth* v. *MacGregor*, 319 Mass. 462, 463. *Commonwealth* v. *Conroy*, 333 Mass. 751, 757. *Commonwealth* v. *King*, 356 Mass. 495, 499. *Commonwealth* v. *Lacey*, 358 Mass. 800. Compare *Commonwealth* v. *Kerrigan*, 349 Mass. 295, 297.

2. The decisions in *Escobedo* v. *Illinois*, 378 U. S. 478, and *Miranda* v. *Arizona*, 384 U. S. 436, are not applicable

to this case, which was tried before those decisions were rendered. *Commonwealth* v. *Mele*, 358 Mass. 225, 228. *Commonwealth* v. *Daly*, 358 Mass. 818. *Johnson* v. *New Jersey*, 384 U. S. 719, 733. *Jenkins* v. *Delaware*, 395 U. S. 213, 221–222. "The question was whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question was to be resolved in light of the totality of the circumstances. See, e.g., *Davis* v. *North Carolina*, 384 U. S. 737; *Haynes* v. *Washington*, 373 U. S. 503, 513–516; *Spano* v. *New York*, 360 U. S. 315, 323; *Ashcraft* v. *Tennessee*, 322 U. S. 143, 147–148." *Procunier* v. *Atchley*, 400 U. S. 446, 453. See also *Boulden* v. *Holman*, 394 U. S. 478, 479–481.

After a voir dire hearing the judge ruled "that if there is a confession offered that it was a voluntary confession." The failure of the police to give a suspect an official warning of his right to silence is a factor in determining whether a suspect's statement was made in the unfettered exercise of his own will, *Commonwealth* v. *Kleciak*, 350 Mass. 679, 685, and the judge's findings show that he took account of that factor. He also took account of the defendant's testimony that he was "confused and nervous," but when counsel suggested that the defendant was "dazed" the judge correctly indicated that there was no such evidence. The most usual forms of coercion are "continuous questioning and denial of access to friends, family, and counsel." *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 585–586. The defendant agreed with police testimony that there was no such denial of access, and the judge accepted the police testimony that the conversation about using the telephone and calling a lawyer occurred during the defendant's first half hour in the police barracks. The questioning took place over a seven and one-half hour period. The subsequent testimony disclosed that the questioning was broken by a trip, lasting over an hour, to retrace the defendant's route. The defendant is shown by his own testimony to have been an intelligent, mature combat veteran and there

is no suggestion or trace of fear or fetter in his account. If, as he contends, we are required to make our own independent determination whether his confession was voluntary, we have done so, and are convinced beyond a reasonable doubt that it was voluntary.

3. The defendant contends that it was error not to submit to the jury the issue whether the confession was voluntary. Our well established practice, of course, is to submit this issue to the jury without any request from the defendant. But it would be anomalous to require such a submission where it might be contrary to the theory and strategy of the defendant. We think submission could be and was waived. "It seems clear to us from the transcript that the defendant was content to let the issue of voluntariness rest on the ruling made by the judge in the absence of the jury." *Commonwealth* v. *Johnson*, 352 Mass. 311, 317, cert. den. sub nom. *Johnson* v. *Massachusetts*, 390 U. S. 511. After the judge's ruling on voir dire, the defendant renewed his objection to the written statement when it was offered, but he did not object to testimony about the defendant's oral statements to the police. In his own testimony before the jury, on direct examination, he testified to those statements and sought to explain discrepancies between his testimony and those statements. The explanation did not suggest that the statements were involuntary, and after the voir dire the defendant did not introduce any other evidence, by cross-examination or otherwise, explicitly directed to voluntariness. His counsel did not refer to the issue of voluntariness in his opening or in his argument, nor did the defendant in his unsworn closing statement to the jury. Although the defendant took numerous exceptions with respect to requests for instructions, none related to this issue. The judge in his charge did not mention the issue, and no exception was taken on that account. We conclude that after the voir dire the question of voluntariness was not "raised with sufficient point to require an express admonition to the jury by the Court [on its own mo-

tion]." See *Stevenson* v. *Boles,* 331 F. 2d 939, 942 (4th Cir.), affd. per cur. sub nom. *Boles* v. *Stevenson,* 379 U. S. 43. *United States* v. *Inman,* 352 F. 2d 954, 956 (4th Cir.), and *Mullins* v. *United States,* 382 F. 2d 258, 262 (4th Cir.), have been limited to Federal prosecutions and "did not prescribe a rule of constitutional application to prosecutions in state courts within this Circuit." *Morris* v. *Boles,* 386 F. 2d 395, 402 (4th Cir.). In so far as they are contrary to the view we take, they seem to us to be out of harmony with the opinion in *Boles* v. *Stevenson,* 379 U. S. 43, 45–46, and we do not follow them. See *Woody* v. *United States,* 379 F. 2d 130, 131 (D. C. Cir.).

4. The defendant urges us to reduce the verdict to voluntary manslaughter or at most murder in the second degree. We have that power under G. L. c. 278, § 33E. *Commonwealth* v. *Bearse,* 358 Mass. 481, 487–488. *Commonwealth* v. *Ransom,* 358 Mass. 580, 583. *Commonwealth* v. *Rego,* ante, 385, 393–397. The propriety of the conviction depends largely on an appraisal of the defendant's testimony, which we, unlike the judge and jury, did not see or hear. See *Commonwealth* v. *Nassar,* 354 Mass. 249, 265. Apart from that testimony, the jury could have found that the defendant argued with the victim, went to his home to get a gun and clip, intending to shoot the victim, and shortly thereafter did shoot the victim at least seven times and killed him. The question whether there was deliberate premeditation was fairly submitted to the jury, which deliberated for more than six hours and recommended that the death sentence be not imposed. Within two weeks after the verdict the judge, on a motion for new trial, considered whether the verdict was against the weight of the evidence, and concluded that it was not. We are not prepared to make a substitute judgment.

*Judgment affirmed.*