COMMONWEALTH *vs.* CARLOS GARCIA.

Worcester.   September 10, 1979. — January 8, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel, Confrontation of witness. *Waiver. Evidence,* Admissions and confessions, Preliminary question. *Practice, Criminal,* Instructions to jury, Voluntariness of confession. *Homicide. Self-Defense. Interpreter. Due Process of Law,* Interpreter. *Error,* Harmless. *Words,* "Reasonable doubt."

A defendant's spontaneous exclamation to a police officer was admissible without proof of any prior Miranda warnings where the defendant was not in custody or even under suspicion when he made the statement. [426-427]

At a criminal trial, there was sufficient evidence to warrant findings that the Spanish-speaking defendant understood the Miranda warnings, that he knowingly and intelligently waived his rights in electing to make statements to the police, and that the statements were made by him freely and voluntarily. [427-432]

At a criminal trial, there was sufficient evidence to warrant a finding that certain statements made by the defendant were voluntary. [432-434]

There was no support in the record of a trial of a Spanish-speaking defendant for a claim that, because his trial counsel spoke no Spanish, he was denied effective assistance of counsel. [434-435]

Where, at all times during a Spanish-speaking defendant's probable cause hearing, his hearing on a motion to suppress, and his trial, the defendant had a qualified interpreter who conferred with him constantly and informed him of the substance of questions, answers, and court rulings, his right to be present at trial and to confront witnesses against him was fully protected. [435-438]

At a murder trial, there was sufficient evidence, including evidence that, after the victim had been shot and had fallen, the defendant shot him three or four times more, and that three of the bullet entrance wounds were in the victim's back, to warrant a finding that the defendant had not acted in self-defense. [437]

At a criminal trial held before this court's decision in *Commonwealth v. Ferreira*, 373 Mass. 116 (1977), where there was overwhelming evidence of the defendant's guilt, the defendant was not prejudiced by the judge's error in including in his instruction on reasonable doubt specific examples of important decisions in the jurors' daily lives. [438-441] LIACOS, J., dissenting.

Although the judge at a criminal trial failed to state specifically that the Commonwealth had the burden of proof on the voluntariness of the defendant's statements, his instructions were sufficiently complete to impress upon the jury that the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant made his statements voluntarily. [441-443]

There was no merit to a defendant's contention that the judge at his criminal trial erred in instructing the jury on the standard regarding the voluntariness of the defendant's statements. [443-444]

INDICTMENT found and returned in the Superior Court on September 29, 1970.

The case was tried before *Brogna*, J., and a motion for a new trial was heard by him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Richard J. Vita* for the defendant.

*Daniel F. Toomey*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant Carlos Garcia was convicted of murder in the second degree after a trial by jury in 1970. The judge imposed the statutory sentence of life imprisonment. At trial, Garcia admitted killing the victim, Francisco Alvarado, but claimed that he had acted in self-defense. The case is now before us in a consolidated appeal under G. L. c. 278, §§ 33A-33G, assigning alleged errors during the trial and in the denial of the 1977 motion for a new trial (G. L. c. 278, § 29).[1] The principal questions presented for our consideration are the following: (1) whether Garcia's difficulty communicating with his non-Spanish speaking trial attorney deprived him of his right to effective assistance of counsel or his right of confrontation, (2) whether the judge erred in admitting Garcia's admissions and confession in evidence, and (3) whether the judge erred in instructing the jury on reasonable doubt and on the burden of proof of voluntariness of Garcia's statements. We affirm the conviction.

We briefly summarize the evidence presented at the 1970 trial.[2] At approximately 4:30 P.M. on July 9, 1970, Garcia was involved in a dice game near Main Street in Worcester

---

[1] After the 1970 verdict, the defendant did not appeal within the statutory twenty-day time limit, G. L. c. 278, § 33B. At the hearing on the motion for a new trial, there was conflicting evidence whether Garcia had declined to appeal within the time limited by statute. In 1975, Garcia filed a petition seeking reinstatement of his appellate rights, and it was allowed by a single justice of this court. Garcia subsequently filed a motion for a new trial, which was heard in 1977. The judge who presided at the trial denied the motion, and Garcia appealed the denial to the Appeals Court. We transferred the case to this court on our own motion, and consolidated the direct appeal with the appeal from the denial of the motion for new trial.

[2] Further evidence will be discussed below in conjunction with the errors alleged; evidence presented at the new trial motion hearing will also be discussed below.

with several other persons. At some point one Leonides Baez accused Garcia of playing with loaded dice. An altercation ensued, during which Garcia struck Baez. Garcia then went to his home at 4 Kilby Street in Worcester, and, about thirty minutes later, on the street near his home, he encountered Baez's sisters, Carmen and Marta; the victim Francisco Alvarado; and Alvarado's brother. The Baezes and the Alvarados began yelling at Garcia, and Garcia struck Carmen Baez. The Alvarados and Garcia then engaged in a fist fight, after which Garcia retreated toward his house.

The next day, July 10, Garcia went to Carmen Baez's house. He told her he wanted no problems with anyone, and apologized for what he had done. Carmen refused to forgive him and told him they were not afraid of him. Garcia then went to a place where he had hidden a gun that he had purchased from a "hippie" and he loaded it and put it in his pants. He also put six or seven extra bullets in his pocket and proceeded to Main Street, near Monihan's Cafe. While walking past Monihan's, he saw Francisco Alvarado, the victim, who said to him, "I owe you one from last night," or words to that effect. Garcia saw nothing in Alvarado's hands, but Alvarado then reached for his back pocket. Garcia thought Alvarado was reaching for a "knife or something," and thereupon he took the gun from his pants and began firing at Alvarado. He continued to fire after Alvarado put both hands on his stomach and began to fall. Witnesses saw Garcia fire three times after Alvarado was on the ground. The State pathologist testified that there were two bullet entrance wounds in the front of the victim's body and three in the back, and that one of the bullets entering from the rear penetrated the heart and caused death. Garcia conceded during his testimony that he could have run away from Alvarado, "but I didn't because I was scared."

Immediately following the shooting, Garcia ran, hid the gun and then went to look for a policeman. He found a plainclothes police officer, to whom he said, "I did it, I did it," before the officer spoke. The officer (Healey) asked Garcia if he understood English, and received an affirma-

tive answer. No other conversation was had at that point. Healey placed Garcia in a police cruiser, where Officer Conrad asked him if he understood English, received an affirmative response, and informed him of his Miranda rights. Conrad then asked him where the gun was, and Garcia led the officers to it. At the location where he had hidden the gun, he was again informed of his Miranda rights and he again said that he understood them.

Shortly thereafter, the officers took Garcia to the police station, where he was again read his Miranda rights in English and in Spanish. A Spanish speaking police officer (Guittar) interpreted for him throughout the interrogation, and Garcia gave the police a signed statement concerning the shooting. Officer Guittar translated the written statement for Garcia before the latter signed it.

Several of Garcia's alleged errors hinge on his claimed difficulty in speaking and understanding English in 1970. He contends that he is entitled to relief by reason of this language difficulty as it bears upon the questions (a) whether he waived his rights under the decision of *Miranda* v. *Arizona,* 384 U.S. 436 (1966), (b) whether his statements to the police shortly before and after the time of his arrest were voluntary, and (c) whether he was denied the right to effective assistance of counsel in preparation for and during his trial, with resulting denial of rights of due process and of confrontation. Because of the claimed language difficulty we have scrutinized the record with special care. It reveals that Garcia was not fluent in English at the time of his trial in 1970, but that he spoke and understood some English. The basic question for our decision in this regard is whether his language difficulty operated to deprive him of any constitutional right or of a fair trial. We shall review the evidence concerning Garcia's facility with the English language further as we discuss each of the issues in which that may be a factor.

1. *Application of and compliance with Miranda decision.* We are concerned here with three separate statements made by Garcia to the Worcester police, all of which the judge admitted in evidence at the trial.

The first such statement was Garcia's spontaneous ex-
clamation to Officer Healey, "I did it, I did it." Since Heal-
ey had said nothing to Garcia, who was not then in custody
or even under suspicion, this statement was clearly admissi-
ble without proof of any prior Miranda warnings, and Gar-
cia does not claim otherwise.[3] *Commonwealth* v. *Ladetto,*
349 Mass. 237, 243-244 (1965). Cf. *Miranda, supra* at 444,
478; *Escobedo* v. *Illinois,* 378 U.S. 478, 490-491 (1964);
*Commonwealth* v. *Glavin,* 354 Mass. 69, 72-73 (1968);
*Commonwealth* v. *Kerrigan,* 349 Mass. 295, 298-299 (1965);
*Commonwealth* v. *Swenor,* 3 Mass. App. Ct. 65, 68 (1975);
*Commonwealth* v. *Roy,* 2 Mass. App. Ct. 14, 18 (1974).

We next consider two separate statements made by Garcia
after he was taken in custody by the police. One consisted of
his conversation with the police when they first took him in
custody and, at his direction, drove him to the spot where he
pointed to the gun which he had hidden there after shooting
Alvarado. The other consisted of a written statement which
he signed at the police station, admitting that he "took the
gun out of [his] pants and shot [Francisco Alvarado] . . .
three or four times." Although both of these statements were
made by Garcia before he was formally booked by the police,
we treat them as made in the course of custodial interroga-
tion. We treat custody as having begun at the moment when
the police first placed Garcia in the cruiser. *Miranda, supra*
at 444. *Commonwealth* v. *Haas,* 373 Mass. 545, 552-553
(1977). From that moment he was not free to leave.

The admissibility of these two statements made by Garcia
while in custody and without benefit of counsel gives rise to
several questions. The first is whether Garcia truly under-
stood his Miranda rights (given to him in English in the
cruiser and both in English and in Spanish at the police sta-
tion) in order to be capable of waiving them "knowingly
and intelligently," and, if not, whether the police were en-

---

[3] Garcia admitted at trial that he wanted to talk to a policeman after
the shooting "[b]ecause I knew I had shot him and I wanted to see the
police . . . I didn't know the law. All I want[ed] was him to take me
away." Healey did not advise Garcia of his rights.

titled to rely on Garcia's continued assurances that he did understand. The next question is whether any waiver by Garcia of his rights was voluntary. The question of the voluntariness of the waiver of those rights and that of the voluntariness of the statements which Garcia made to the police may be interrelated, but they are separate and distinct questions. The former is whether the Miranda requirement of warnings was scrupulously observed and whether Garcia knowingly, intelligently and voluntarily waived the rights covered by the warnings. The latter is whether Garcia's statements were made freely and voluntarily when considering the "totality of the circumstances" in which they were made. *Procunier* v. *Atchley,* 400 U.S. 446, 453 (1971). *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 533 (1975). The inquiry into whether a statement was made freely and voluntarily is the same whether it arises under the Miranda rule or whether it arises in the determination of whether a confession was made freely and voluntarily. *Commonwealth* v. *Cruz,* 373 Mass. 676, 688-689 (1977). *Commonwealth* v. *Mahnke,* 368 Mass. 662, 679-680 (1975), cert. denied, 425 U.S. 959 (1976).

When the judge denied the motion to suppress Garcia's in-custody statements to the police, he made no report of facts found in support of his ruling. We emphasize once again the importance of findings of subsidiary facts in such a situation. *Commonwealth* v. *Hosey,* 368 Mass. 571, 574 n.1 (1975). We have remanded some cases to the trial court with instructions to make such findings, but we do not do so in this case because the judge did make limited findings on this issue in denying the motion for a new trial. In his written decision denying the latter motion the judge said in part: "I had previously ruled on the Motion to Suppress that the defendant had adequately understood the Miranda Warnings given to him by the police. . . . I again find that Mr. Garcia adequately understood the Miranda Warnings. In spite of somewhat of a language barrier, the voir dire hearings show that a Spanish-speaking police officer translated and explained the Miranda Warnings to Mr. Garcia."

Since these findings of subsidiary facts involve the credibility of oral testimony and the judge's opportunity to observe the witnesses, they are not likely to be disturbed by us when they are warranted by the evidence. However, the ultimate conclusions drawn from such subsidiary findings are subject to our review. *Commonwealth* v. *Murphy*, 362 Mass. 542, 548 (1972), quoting from *Commonwealth* v. *Frank*, 357 Mass. 250, 253-254 (1970). *Murphy, supra* at 550, 551 (Hennessey, J., concurring).

We summarize at this point the evidence which, in addition to that noted earlier in this opinion, bears on this issue. Several of the officers had conversations in English with Garcia and none had any difficulty communicating. The interrogation at the police station was conducted largely in English, with Officer Guittar translating only a few times. Detective O'Leary, who obtained the statement at police headquarters, testified that he called Officer Guittar as a precaution, and that it was common police practice to call an interpreter for a Puerto Rican person suspected of a serious offense. The police conducted no interrogation and elicited no statement from Garcia before Guittar arrived. Although Garcia now says that Guittar spoke a different type of Spanish, Guittar testified that he understood Garcia, and that Garcia at the time said he understood Guittar. The statement signed by Garcia was read to him in both English and Spanish; he said he understood it and wanted to sign it. On the witness stand, Garcia corroborated the essential facts in the statement.

Where, as here, the voluntariness of statements made during a custodial interrogation without counsel present is at issue, the State bears a heavy burden of proving knowing, intelligent and voluntary waiver. *Miranda, supra* at 475. *Commonwealth* v. *Dustin*, 373 Mass. 612, 614 (1977), cert. denied, 435 U.S. 943 (1978). A confession can be voluntary in the legal sense only if the suspect actually understands the import of each Miranda warning. See *Miranda, supra* at 467-476; *Commonwealth* v. *Williams*, 378 Mass. 217, 224-225 (1979); *Commonwealth* v. *White*, 374 Mass. 132, 137-138

(1977), aff'd by an equally divided court, 439 U.S. 280 (1978); *Hosey, supra* at 577. Police officers may infer such understanding, however (in the absence of evidence of coercion, duress, incompetency, or other such factors), from the suspect's outward behavior, most notably his indication that he understands his rights, waives them, and wishes to talk. Here, the police made every effort to ensure that Garcia understood English and his rights. There was no evidence of coercion, duress or improper suggestion. There was no evidence of any circumstance (such as drunkenness, drug influence or mental incompetency) which would have led officers to proceed with greater than normal caution in relying on Garcia's affirmative signs of knowing waiver.[4]

The Fifth Amendment exclusionary rule is largely a prophylactic measure to discourage coercive or otherwise improper police procedures. *Miranda, supra* at 467. *Commonwealth* v. *Jackson,* 377 Mass. 319, 326 (1979). Here, that goal was amply served, and the requirement of a knowing and intelligent waiver was also met. The judge chose to disbelieve Garcia's claim that he complained to Guittar of noncomprehension, and chose instead to believe Guittar that Garcia said he understood and appeared to understand. We will not interfere with that choice. *Commonwealth* v. *Meehan,* 377 Mass. 552, 557 (1979), cert. granted, 444 U.S. 824 (1979). *Commonwealth* v. *Doyle,* 377 Mass.

---

[4] In certain limited circumstances, the police are charged with observing greater caution in relying on signs by the accused that he understands and waives his Miranda rights. See *Commonwealth* v. *Hosey,* 368 Mass. 571 (1975) (intoxication and irrational behavior); *Commonwealth* v. *White,* 374 Mass. 132 (1977), aff'd by an equally divided court, 439 U.S. 280 (1978) (intoxication); *Commonwealth* v. *Daniels,* 366 Mass. 601, 608 (1975) (mental retardation). But see *Commonwealth* v. *Hooks,* 375 Mass. 284, 287-290 (1978) (upholding trial judge's rejection of defendant's claim that he did not understand warnings because of marihuana influence); *Commonwealth* v. *Fielding,* 371 Mass. 97, 100 (1976) (drug withdrawal syndrome does not necessitate suppression). Although drug and alcohol cases rest very heavily on a possible inability of the suspect to exercise his will, and are thus superficially distinguishable from the present case, certainly a failure of cognition can effect a failure of volition. We do not maintain otherwise in this case.

132, 138 n.6 (1979). That a waiver of rights must be knowing and intelligent does not mean that with the hindsight of conviction the defendant would not have chosen to talk to the police. Rather, it means that police procedures must scrupulously respect the suspect's free choices, made with actual knowledge of his rights at the time of interrogation.

The evidence in the record supports the subsidiary findings of the judge, whether they be those implied in his denial of the motion to suppress or those expressed in his denial of the motion for a new trial, that the defendant understood the Miranda warnings, that he knowingly and intelligently waived his rights thereunder and elected to make the statements in question to the police, and that the statements were made by him freely and voluntarily. Such findings in turn support the judge's action in denying the motion to suppress and his admission of the statements in evidence. There was no error in so far as the Miranda rule is concerned.

In all of our discussions to this point in this opinion we have referred to Garcia's in-custody statements without attempting to classify them as either admissions or confessions. That is unnecessary because of the following language in *Miranda, supra* at 476: "The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."

In charging the jurors the judge instructed them that if they found that prior to the time Garcia made any in custody statements to the police they did not inform him of his Miranda rights, they should disregard the statements. He instructed them further that, if the Miranda warnings were given but that, because of language difficulties or for any

other reason Garcia did not intelligently waive his rights covered by the warnings, they likewise should disregard his statements to the police. This action by the judge has not been put in issue, and we therefore intimate no opinion on whether the judge was required to submit to the jury for decision the same preliminary factual questions regarding the Miranda questions, on which he passed when the statements were offered in evidence. This question was alluded to, but not decided, in *Commonwealth* v. *Chung*, 378 Mass. 451, 458 n.9 (1979). In any event, if the instructions were erroneous in this regard, the defendant might profit, but could not be injured thereby.

2. *Voluntariness of Garcia's statements, apart from requirements of Miranda decision.* "The practice has long been established in this Commonwealth that, when statements amounting to a confession are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing by the presiding judge in the absence of the jury. If he is satisfied that they are voluntary, they are admissible; otherwise they should be excluded. If the judge decides that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant." *Commonwealth* v. *Marshall*, 338 Mass. 460, 461-462 (1959), and cases cited therein. This practice, sometimes referred to as "the humane practice," has been followed in this Commonwealth for many years, see *Commonwealth* v. *Preece*, 140 Mass. 276, 277 (1885), long predating the approval of such a practice by the decision in *Jackson* v. *Denno*, 378 U.S. 368 (1964).

This court has held in a number of decisions that this "humane practice" gives the defendant a right to a preliminary hearing and decision by the presiding judge on the voluntariness of "a confession, as that word is accurately used in the criminal law," but not "in case of mere incriminating admissions or declarations of subordinate or independent facts" which fall short of a confession. *Commonwealth* v. *Haywood*, 247 Mass. 16, 18 (1923). *Commonwealth* v. *Jokinen*,

257 Mass. 429, 430 (1926). *Commonwealth* v. *Gleason*, 262 Mass. 185, 189-190 (1928). Cf. *Marshall, supra* at 462.

Although the decisions limiting the application of the "humane practice" to confessions have not been overruled to date, there have been statements in some of our more recent decisions which seem to question the exclusion of admissions from its operation. In *Commonwealth* v. *Wallace*, 346 Mass. 9 (1963), we said, at 17: "Notwithstanding the rule in *Commonwealth* v. *Haywood*, 247 Mass. 16, 18, which has been criticised, we assume that the defendant's statements would, because of his youth, be accorded the safeguards applicable to confessions. See Maguire, Evidence of Guilt, § 3.03, and cases collected in note 14." In *Mahnke, supra* at 679 n.24, we again noted the criticism of the rule that "a defendant is entitled to lesser safeguards with respect to the admissibility of admissions and exculpatory statements than he would have if the statements had amounted to a confession," but we concluded that for the purposes of that case "we do not consider its continuing validity." We cited this same footnote from *Mahnke* in *Commonwealth* v. *Fournier*, 372 Mass. 346 (1977) when we said at 348: "For present purposes we assume that we would apply the same standard to admissions as to confessions, even though the admissions on their face are exculpatory rather than inculpatory." In a discussion of this subject in W.B. Leach & P.J. Liacos, Massachusetts Evidence (4th ed. 1967), we find the following statement at 230: "The Massachusetts practice whereby the procedure of determining the admissibility of admissions involved lesser safeguards for the defendant than that involving the admissibility of confessions is now of dubious validity. This is true at least as to express or implied admissions made while the defendant is in custody of the police." See also McCormick, Evidence § 144 (2d ed. 1972). We note these developments, but we need go no further for the purposes of the present case.

We are satisfied from our examination of the record in this case that the judge followed the "humane practice" prescribed by our cases. He held a preliminary hearing and

determined that Garcia's statements were voluntary before admitting them in evidence for consideration by the jury. The evidence of the totality of circumstances in which the statements were made supports his conclusion that the statements were voluntary. The judge did not attempt to distinguish between admissions and confessions. He treated both statements which Garcia made while in custody in the manner in which confessions are required to be treated. He impliedly or expressly found them to have been made voluntarily, and he instructed the jury they should disregard the statements unless they found that they were "made voluntarily and in compliance and after his constitutional safeguards were complied with." It is therefore immaterial that the judge did not single out any statement for treatment as an admission since, "by reason of the statement having been treated as a confession, the defendant was accorded greater safeguards with respect to its admissibility than he would have had in the case of an admission." *Commonwealth* v. *Chapman*, 345 Mass. 251, 254 (1962).

3. *Ineffective assistance of counsel.* Garcia's claim that he was denied effective assistance of counsel, which he raises for the first time on direct appeal, is grounded solely in his asserted difficulty with the English language. Garcia's trial counsel spoke no Spanish, and Garcia now maintains that he was unable to cooperate with him in preparing his defense.

As we recently noted, there is no isolated constitutional test to determine whether a defendant's due process right to effective assistance of counsel has been violated. *Commonwealth* v. *Rondeau*, 378 Mass. 408, 410 (1979). Our cases have tended toward a standard of competence similar to that for legal malpractice. A defendant must demonstrate that his attorney's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer." *Id.* at 412, quoting from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In addition, there must be a showing that the attorney's conduct prejudiced the defendant, which typically may mean loss of "an otherwise available, substantial ground of defence." *Saferian, supra* at 96. *Rondeau, supra* at

413.   Effective assistance is a practical matter, however, and each case is to be judged on its own particular merits.

a.  *The pretrial stage.*  Garcia's family hired and paid for the trial attorney.  The attorney experienced no difficulty communicating with Garcia, and neither Garcia nor his family complained about any lack of understanding at any time during the pretrial preparatory stage or at trial.[5]  The attorney met with Garcia several times before the trial, and every evening during the trial.  At these meetings, Garcia discussed his background and which witnesses the attorney should call in his defense.  We find nothing in the record which indicates that the attorney's conduct fell below ordinary standards of competence at the pretrial stage.

b.  *The trial.*  Garcia has not alleged, through his testimony at the hearing on the motion for a new trial, or through his new counsel who is representing him on appeal, any specific prejudice to his defense as a result of any language barrier.  He has not asserted that a defense was lost; he simply maintains that he could not communicate with his trial attorney his reasons for carrying the gun on the evening of the homicide, and the reason he feared that Alvarado would attack him.  Garcia's present claim is (a) that he had a "great number of enemies on the street" because of his background and reputation as a professional boxer and street fighter and therefore on the day of the homicide he had reason to fear that Alvarado would attack him with a knife, and (b) that his language difficulty prevented him from explaining this to his lawyer.

This subject was raised in "Claim II" of Garcia's motion for a new trial.  The judge's decision in relation to that point opens with the finding that "during all stages of the proceedings the defendant was able to adequately consult with counsel and assist counsel in the preparation of his de-

---

[5] Garcia testified that he did not complain because he was "scared" and ignorant of the law, and his family failed to act because they were unschooled.  We are, of course, mindful that constitutional rights are not accorded only to those who complain of their violation, but in this case we conclude that no constitutional violation was present.

fense," and after reciting subsidiary findings it concludes that "at no time, either prior to trial or during trial, did [Garcia's counsel] have any difficulty communicating with the defendant." Garcia obviously disagrees with these findings, but they are supported by the evidence and for the same reasons stated in part 1 of this opinion we do not disturb them.[6]

The judge charged the jury on the circumstances in which a killing in self-defense would be lawful, as well as the circumstances in which a killing, although in self-defense, but by the use of excessive force, would constitute manslaughter. *Commonwealth* v. *Shaffer,* 367 Mass. 508 (1975). *Commonwealth* v. *Houston,* 332 Mass. 687, 690 (1955). *Commonwealth* v. *Peterson,* 257 Mass. 473, 478 (1926). *Commonwealth* v. *Woodward,* 102 Mass. 155, 161 (1869). In addition, he charged the jury that "the burden of proof does not shift to Garcia to prove to you that what he did was in self-defense; the burden is always on the Commonwealth to prove that the killing was unlawful." *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-691 (1976).

---

[6] In oral argument, Garcia's appellate counsel raised the broader question whether there is a constitutional right to an attorney who speaks one's native language. See generally Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454 (1969). We recognize that there are many persons in this country for whom English is a second language, and we in no way wish to underestimate the importance of the rights of confrontation and effective representation. Nevertheless, we believe that a per se entitlement to bilingual attorneys is neither necessary nor desirable for several reasons. First, at pretrial stages informal interpreters (such as relatives and friends) are available. See *Jara* v. *Municipal Court,* 21 Cal. 3d 181, 184-186 (1978), cert. denied, 439 U.S. 1067 (1979). Second if an attorney discovers that he and his client cannot communicate because of language problems, and no competent informal interpreter is available, the attorney may, in criminal cases, petition the court for the expenses of an interpreter, which the judge may grant in his or her discretion. See G. L. c. 277, § 56; Mass. R. Crim. P. 41, 378 Mass. 918 (effective July 1, 1979); G. L. c. 213, § 8; *Blazo* v. *Superior Court,* 366 Mass. 141, 150-151 (1974); *Abodeely* v. *Worcester,* 352 Mass. 719, 722 (1967). Third, at the trial stage the court will provide qualified interpreters, and neither the prosecution nor the defense should have to depend on a bilingual defense counsel for interpreting the proceedings. Finally, the practical difficulties of locating adequately bilingual counsel might result in less effective communication than the present system of using interpreters.

Upon all the evidence, including testimony that after Alvarado fell, Garcia shot him three or four times more, and that three of the bullet entrance wounds were in Alvarado's back, the jury could reasonably have concluded that the prosecution had met its burden of proving that Garcia did not act in self-defense.

4. *Confrontation right.*' Garcia's contention that he could not understand what transpired at the trial essentially alleges a violation of his right to be "present" at his trial to confront the witnesses against him. See Sixth Amendment to the United States Constitution; art. 12 of the Declaration of Rights to the Massachusetts Constitution; G. L. c. 263, § 5; G. L. c. 278, § 6; *United States ex rel. Negron v. New York,* 434 F.2d 386, 389 (2d Cir. 1970); *Garcia v. State,* 151 Tex. Crim. 593 (1948); *State v. Vasquez,* 101 Utah 444 (1942); Annot., 36 A.L.R. 3d 276 (1971).[7] The right to confront witnesses, and to be present at the proceedings, encompasses the right not to face a "Kafkaesque spectre of an incomprehensible ritual, which may terminate in punishment." *United States v. Carrion,* 488 F.2d 12, 14 (1st Cir. 1973), cert. denied, 416 U.S. 907 (1974). The questions generally are two: (a) at what level of language barrier and at what stage of the proceedings must an interpreter be provided, and (b) how much translation does the defendant require. Although factors such as the complexity of issues at trial and the language ability of counsel are significant, the crucial factor is the level of fluency of a given defendant. That judgment is uniquely within the province of the trial judge, who is in direct contact with the defendant and accordingly must have wide discretion. *Perovich v. United States,* 205 U.S. 86 (1907). *Commonwealth v. Turell,* 6 Mass. App. Ct. 937 (1978). Unless the record reveals bla-

[7] Some language barrier cases have been brought on the grounds of ineffective assistance of counsel, e.g., *Commonwealth v. Alicea,* 376 Mass. 506 (1978); *United States v. Carrion,* 488 F.2d 12 (1st Cir. 1973), cert. denied, 416 U.S. 907 (1974). The test for both confrontation and effective assistance cases in this context is the same: was the defendant hampered by a language problem in any meaningful way in presenting his defense?

tant insensitivity to a language problem, with the result that the defendant was deprived of a fair trial, an appellate court will not disturb the exercise of that discretion.[8]

The record in the present case amply demonstrates the judge's continued sensitivity to Garcia's language problem. The judge conducted a hearing in which he questioned Garcia directly. At the conclusion of the hearing, the judge was not convinced that Garcia needed a translator even for his own testimony. At all times during the probable cause hearing, the hearing on the motion to suppress, and the trial, Garcia had a qualified interpreter. While she did not provide a word-for-word translation of the proceedings, she conferred constantly with Garcia and informed him of the substance of questions, answers, and court rulings. Although the judge did not direct that pauses be allowed for translation while other witnesses testified, the interpreter said she translated for Garcia at the same speed as the witnesses were speaking. It is evident from the record that Garcia had an interpreter if and when he needed one, and that his rights were fully protected.

5. *Jury instructions.* Garcia alleges three errors in the charge to the jury: inadequate instructions on the meaning of "reasonable doubt"; failure to instruct the jury that the Commonwealth bore the burden of proving that his confession was voluntary; and improper instructions on the standard by which to assess the voluntariness of his confession.

a. *Reasonable doubt.* The defendant alleges that the definition of reasonable doubt does not comport with our decision in *Commonwealth* v. *Ferreira*, 373 Mass. 116, 128-129 (1977). There can be little question that the

---

[8] Cases reversed because of failure to provide an interpreter involve either an obvious inability of a defendant to comprehend the import of the testimony against him, or to communicate his defense to the fact finder, or a judicial insensitivity to a language problem. See, e.g., *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 389 (2d Cir. 1970); *Atilus* v. *United States*, 378 F.2d 52 (5th Cir. 1967); *In re Muraviov*, 192 Cal. App. 2d 604, 606-607 (1961); *People* v. *Starling*, 21 Ill. App. 3d 217 (1974); *Parra* v. *Page*, 430 P.2d 834 (Okla. Crim. 1967).

charge given in this case was very similar to that given in *Ferreira.*[9]

Before considering the propriety of the present charge, however, we note that defendant's counsel did not object to that portion of the charge which defined reasonable doubt. In the absence of an objection and exception, although this court may still find reversible error under G. L. c. 278, § 33E, it will do so only "upon a showing of grave prejudice or substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Roberts,* 378 Mass. 116, 123 (1979). *Commonwealth* v. *Burnett,* 371 Mass. 13, 16 (1976).[10] Because we do not require that defense counsel

---

[9] The judge charged the jury that: "The words, 'beyond a reasonable doubt,' on the other hand, do mean that after hearing the evidence, after discussing it among yourselves, after determining what part, if any, of any witness's story you're going to believe, after determining what inference you're going to draw from the evidence, you believe, all twelve of you, that you must be sure, as sure as you want to be when in your own lives you had to make important decisions involving your personal, your social or your economic lives. For example, I am sure that all of you at some time or another in your lives have had to decide whether to quit school or to go on with your education, whether to get married, whether to stay single, whether to get divorced or stay married; whether to buy a house or not, whether to increase the mortgage on the house or not, and when you have had to make this type of a decision, you have weighed the pros and cons. You have carefully thought about it, and if there was a reasonable doubt in your mind that you were not doing the right thing, then you didn't do it. I am not talking about decisions that you have to make of a routine nature, like what color tie to put on in the morning, whether to wear a blue shirt, or what color beads to wear with a particular dress, or whether to buy a Ford or a Chevrolet; I'm talking about more important decisions in your own lives where you weighed the pros and cons seriously and knowing that it is impossible to be absolutely sure, for example, that you were doing the right thing when you decided to get married or get divorced, to buy a house, but if you had a reasonable doubt in your mind that this was not the right thing to do, then you didn't do it, this is what the law means by the expression, 'beyond a reasonable doubt,' that type of sureness that compelled you to act when you, yourself, had to make important decisions."

[10] It is also our "unbroken practice" not to allow use of a motion for new trial to compel a judge to review questions of law which could have been raised at the trial. *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229 (1973). *Commonwealth* v. *Grace,* 376 Mass. 499, 500 (1978).

foresee developments in the case law, we shall consider this issue, and review the propriety of the reasonable doubt charge according to the standard stated above.

The constitutionally significant error, if any, in the charge is not that it referred generally to important decisions in the jurors' daily lives.[11]  Rather it is the use of specific examples which, "far from emphasizing the seriousness of the decision before [the jurors], detracted both from the seriousness of the decision and the Commonwealth's burden of proof." *Ferreira, supra* at 128-130.  We have consistently criticized the "personal decision-making" approach, but in the absence of specific examples have found no error. See *Commonwealth* v. *Williams,* 378 Mass. 217, 232 (1979); *Commonwealth* v. *Allen,* 377 Mass. 674, 680-681 (1979); *Commonwealth* v. *Adrey,* 376 Mass. 747, 756 (1978); *Commonwealth* v. *Seay,* 376 Mass. 735, 745-746 (1978); *Commonwealth* v. *Canon,* 373 Mass. 494, 501-502 (1977), cert. denied, 435 U.S. 933 (1978); *Commonwealth* v. *Gilday,* 367 Mass. 474, 497 (1975).  See also *Commonwealth* v. *Lovell,* 6 Mass. App. Ct. 172, 178 (1978).

Only once before have we considered a charge which included specific examples, and we found the use of analogies in the context of the entire charge, not to constitute reversible error.  *Commonwealth* v. *Grace,* 376 Mass. 499, 500-501 (1978).  *Grace* was an appeal from the denial of a motion for new trial.  Here, in addition, there is a direct appeal.  We hold that the charge in this case, like that in *Ferreira, supra,* is a constitutionally inadequate definition of "beyond a reasonable doubt."  The use of specific examples

---

[11] State and Federal courts, including the United States Supreme Court, have consistently approved general references to the daily lives of jurors. See, e.g., *Holland* v. *United States,* 348 U.S. 121, 139-140 (1954); *Hopt* v. *Utah,* 120 U.S. 430, 439-441 (1887); *United States* v. *Robinson,* 546 F.2d 309, 313 (9th Cir. 1976), cert. denied sub nom. *Chew* v. *United States,* 430 U.S. 918 (1977); *Foran* v. *Metz,* 463 F. Supp. 1088, 1092 (S.D.N.Y. 1979).  The rule in Federal courts is that these general references should be phrased in terms of doubts which would cause jurors to "hesitate to act" in their own decisions, rather than those that would make them "willing to act." *Holland, supra* at 140.

"trivializes" the standard of proof in the direction of the "preponderance of the evidence" standard. Cf. *Bumpus* v. *Gunter,* 452 F. Supp. 1060, 1061 (D. Mass. 1978).[12]

Although we find constitutional error in this charge, we must also consider whether this holding applies to the present defendant, whose trial took place some seven years before our decision in *Ferreira, supra.* We believe that *In re Winship,* 397 U.S. 358 (1970), made retroactive by *Ivan V.* v. *New York,* 407 U.S. 203 (1972), mandates retroactive application of *Ferreira.* We emphasize, however, that we will scrutinize more carefully jury instructions given after the date of *Ferreira.* Cf. *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 692 (1976); *Commonwealth* v. *Collins,* 374 Mass. 596, 599 (1978); *Commonwealth* v. *Stokes,* 374 Mass. 583, 590-591 (1978).

We must next consider whether the error in the present case, while of constitutional dimension, was harmless. *Chapman* v. *California,* 386 U.S. 18 (1967). *Commonwealth* v. *MacDonald,* 368 Mass. 395, 399 (1975). *Commonwealth* v. *Hanger,* 377 Mass. 503, 510 (1979). The reasonable doubt standard is most crucial in cases where central facts (such as identity, or the occurrence of an event) are at issue, and credibility plays a key role. The present case involved no such dispute: the defendant testified and corroborated all of the essential elements of the Commonwealth's case. The homicide here occurred in broad daylight in the presence of witnesses who testified. Even if Garcia had not testified, the circumstantial and direct, eyewitness testimony implicating him was very strong. The only issues the jury faced were whether the killing was justified in self-defense and, if so, whether Garcia exercised that right imperfectly (to result in manslaughter) or, if not, whether the killing was first or second degree murder. Therefore, unlike *Ferreira,* where we expressly stated that

---

[12] We do not believe that it is wise to dissect a charge to determine if each part is constitutionally adequate. Instead we think a court must consider a charge in its totality to assess the impression it may have left with jurors. *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 690-691 (1976), and cases cited.

we considered the charge in the light of "not overwhelming" evidence of Ferreira's guilt, *Ferreira, supra* at 128, the present case involves overwhelming evidence of guilt. We are convinced beyond a reasonable doubt that the error did not contribute to the guilty verdict, and that it was therefore harmless. See *Chapman, supra* at 22-24.

b. *Burden of proof.* Garcia further maintains that the judge failed to tell the jury that the Commonwealth bears the burden of proof of the voluntariness of his statements. While the judge did not specifically so state, he told the jury that the Commonwealth must prove every element of the case beyond a reasonable doubt, and then included the confession (and its voluntariness) as part of the case. The jury could easily have inferred that the Commonwealth had to prove the voluntariness of Garcia's confession beyond a reasonable doubt. Although, as discussed above, the judge's definition of reasonable doubt was deficient, even assuming — and we do not decide this — that the instructions effectively reduced the standard of proof to preponderance of the evidence, that is the Federal constitutional standard for voluntariness of a confession. *Lego* v. *Twomey*, 404 U.S. 477, 486 (1972). While it is preferable that a trial judge include in the jury instructions on voluntariness, if given,[13] an explicit instruction on the burden of

[13] This court has never held, as a matter of constitutional law, that the defendant has a right to have the jury reconsider the voluntariness of his confession. *Commonwealth* v. *Alicea, supra* at 522-523. *Commonwealth* v. *Johnston*, 373 Mass. 21 (1977). *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972). Cf. *Commonwealth* v. *Harris*, 371 Mass. 462 (1976). In *Harris*, we held that as a matter of Massachusetts practice, where a judge admits a confession in evidence after determining that it was made voluntarily, and there is evidence of coercion, it is reversible error not to submit the issue of voluntariness to the jury. *Id.* at 474. The United States Supreme Court recognized that some States follow the "Massachusetts procedure," but it held that there is no Federal constitutional right to have the jury reconsider voluntariness. *Lego* v. *Twomey*, 404 U.S. 477, 481 n.3, 489-490 (1972).

The Federal Constitution of course requires that at some point in the proceedings, before a confession is admitted in evidence, the defendant must "have a fair hearing and a reliable determination [by a judge] on the issue of voluntariness, a determination uninfluenced by the truth or falsity

proof, in the present case the instructions were sufficiently complete to impress upon the jury that the Commonwealth had the burden of proving beyond a reasonable doubt that Garcia made his statements voluntarily. We find no error.

c. *Standard for voluntariness.*[14] Finally, Garcia alleges that the judge erred in instructing the jury on the standard regarding the voluntariness of Garcia's statements. He maintains that the judge told the jury to disregard Garcia's statements only if there was an actual threat of brutality or no proper waiver of Miranda rights. We have reviewed the instructions in this regard, and find the defendant's allegation unsupported. The judge told the jury, "Now by voluntary we mean three things." The first was whether the oral or written statements were "made under any threat of injury or violence to be done to him, or were they induced by any promise that if he said something, the police would go easy on him, or it would go easy with him." The second was whether the police had actually informed him of his Miranda rights (here the judge explained "custody" and enumerated the warnings). The third was whether "he understood what the police were warning him . . . and understood enough English to know what the officers were talking about and made a decision that he would answer their questions anyway . . . . If he did not . . . then you are to use no part of any statement . . . ."

We have noted in a recent decision that the jury's consideration of the issue of voluntariness of a confession is not limited to the question whether the Miranda warnings were given, or whether the rights thereunder were waived, and held that additionally the jury must consider any circum-

---

of the confession." *Jackson* v. *Denno,* 378 U.S. 368, 376-377 (1964). In the present case, the judge rendered this ruling in denying the motion to suppress the statements.

[14] The defendant argued before this court that the judge erred in not instructing the jury to consider the "totality of the circumstances." Although the judge did not use this phrase, he instructed the jury in effect to consider all the circumstances that the evidence raised, and that we considered in part 1 of this opinion.

stances which may militate against the true voluntariness of the confession. *Chung, supra* at 458-459. In that case the judge failed to instruct the jury to consider the effect of evidence of the defendant's insanity on the issue of voluntariness. In the present case we had instead evidence of language problems and a claim of coercion, and the judge did instruct the jury to consider those factors in deciding whether Garcia's confession was voluntary. He further instructed the jury to consider whether the Miranda warnings were given to Garcia before he signed the confession, and also whether he understood them.[15] In short, his instructions permitted the jury to consider the totality of the circumstances in which the confession was made in determining whether the confession was voluntary. There was no error in this regard.

6. Finally, the defendant asks that we exercise our discretion under G. L. c. 278, § 33E, to reduce the verdict to manslaughter. This we decline to do. As discussed above, the jury could reasonably have found that there was no right to self-defense, either because Garcia's fear that Alvarado had a knife was not reasonable, or because Garcia could have retreated, or both. Even if the jury found that Garcia had a right to self-defense initially, they may have found that the right terminated when Alvarado fell to the ground (after which the fatal shot was fired). The jury therefore properly rejected a reduction of the crime to manslaughter through improper use of self-defense.

*Judgment affirmed.*
*Order denying motion for*
*new trial affirmed.*

---

[15] This case was decided before our decision in *Chung, supra*, in which we noted that we had not yet decided whether the question of compliance with the Miranda requirements of a warning must be submitted to the jury for their decision. Nevertheless, we recognized that the question whether such a warning was given might properly be considered on the issue of voluntariness of a confession.

LIACOS, J. (dissenting). I agree with the majority that the charge to the jury on reasonable doubt was erroneous. I do not believe, as the majority holds, that an erroneous charge on reasonable doubt can constitute harmless error. The majority cites no cases which so hold, and I am aware of none. See *Dunn* v. *Perrin,* 570 F.2d 21 (1st Cir. 1978).

The majority is apparently convinced that the error was harmless beyond a reasonable doubt because of the "overwhelming evidence of guilt."[1] The court states, "[T]he defendant testified and corroborated all of the essential elements of the Commonwealth's case . . . . The only issues the jury faced were whether the killing was justified in self-defense and, if so, whether Garcia exercised that right imperfectly (to result in manslaughter) or, if not, whether the killing was first or second degree murder."[2] As the majority has specifically commented on the issue of self-defense, I will focus on it for purposes of this analysis.

This court stated in *Connolly* v. *Commonwealth,* 377 Mass. 527, 529-530 (1979), "As malice is an essential element of murder, and a proper exercise of self-defense negates malice, it follows from *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), that the Commonwealth bears the burden of proving beyond a reasonable doubt, in any case where the issue arises, that there was not a proper exercise of self-defense; and the judge should so charge." Given, as the majority has held, that the charge on reasonable doubt was erroneous, it follows that the jury were improperly instructed as to the standard of proof required of the Commonwealth in order to sustain its burden of proving the element of malice (i.e., no proper exercise of self-defense). Likewise, of course, the high standard of proof required of the Commonwealth with respect to the remaining elements of the crime of murder was "trivialized" by the reasonable doubt charge given.

---

[1] The prosecution bears the burden of proof on appeal that the error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24 (1967). *Commonwealth* v. *Hanger,* 377 Mass. 503, 510 (1979). The Commonwealth does not raise the harmless error doctrine in its brief.

[2] See text *supra* at 441.

The United States Supreme Court has indicated that an unconstitutional jury instruction on an element of the crime cannot constitute harmless error. See *United Brotherhood of Carpenters & Joiners* v. *United States,* 330 U.S. 395, 408-409 (1947). Cf. *Bollenbach* v. *United States,* 326 U.S. 607, 614-615 (1946). See also *Sandstrom* v. *Montana,* 442 U.S. 510, 524 (1979), and *Hammontree* v. *Phelps,* 605 F.2d 1371, 1380 (5th Cir. 1979). *Chapman* v. *California, supra,* cited by the majority in support of its holding that the error in the instant charge was harmless, did not involve an unconstitutional jury charge affecting an element of the crime. Furthermore, *Chapman* recognizes that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ." *Id.* at 23. I believe that an erroneous instruction on reasonable doubt presents such a situation. Accordingly, I conclude that reversal is required in this case.