**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dale Clifford ROBINSON,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earl R. CHEW, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Benny O. GREEN, Defendant-Appellant.**

**Nos. 76–1142, 76–1155 and 76–1156.**

United States Court of Appeals,
Ninth Circuit.

Nov. 18, 1976.

Certiorari Denied March 7, 1977.
See 97 S.Ct. 1333.

Meyer L. Ziman, Phoenix, Ariz., for defendant-appellant in No. 76–1142.

Susan M. Freeman (argued), Lewis & Roca, Phoenix, Ariz., for defendant-appellant in No. 76–1155.

William F. Hyder (argued), Phoenix, Ariz., for defendant-appellant in No. 76–1156.

W. Ronald Jennings, Asst. U. S. Atty. (argued), Phoenix, Ariz., for plaintiff-appellee.

Before CARTER, WRIGHT and WALLACE, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

This is a consolidated appeal of the convictions of the three appellants by a jury for conspiring to steal and receive government property, in violation of 18 U.S.C. § 371. We affirm.

### Facts

The Gila Bend Gunnery Range, located in Arizona, is a test site for Air Force weapon-

ry. Large amounts of valuable metals such as brass and aluminum are left on the ground after the testing. From time to time, this scrap metal is collected by the Air Force and sold. Theft of the scrap materials is a continuing problem.

The Waterhole Bar, located in Gila Bend, is apparently a hangout for traffickers in brass and aluminum stolen from the range. Air Force personnel, including two of the government's key witnesses in this case, frequent the bar in order to receive payoffs for information about the location of the metals. Appellants Robinson and Green were often in the bar. Robinson often got information about the ranges while Green did so on at least one occasion.

During this period, Rica "Stony" Hardin became the girl friend and roommate of Robert Land, a co-defendant not appealing his conviction. She testified that Land, Robinson, and other co-defendants frequently went off to the range at night. Before doing so, they would notify Chew, who operated a nearby smelter and purchased the scrap metal from the others after pickup. Hardin also testified that Green visited Land on two occasions.

During the period of the indictment, several defendants were arrested on the gunnery range. Robinson was among this group. Neither Chew nor Green was arrested on the range itself.

An FBI agent who appeared as a witness in the case interviewed Hardin before trial. He made handwritten notes of the interview, which he destroyed according to standard FBI procedure after dictating a "302 Report." Appellant Chew made motions to produce the original notes or dismiss the indictment, which were denied by the district court.

Appellants were tried and convicted by a jury in December 1975. Chew was sentenced to one year imprisonment; Robinson received 18 months;[1] and Green was given a suspended sentence with five years probation. Appellants are now free on bail.

### Change of Venue

■ One and a half years prior to the trial of the appellants, five young Mexican boys died of thirst and heat exposure on the Gila Bend Gunnery Range. This event received extensive publicity in the local news media for about a month after its occurrence. There was additional publicity at the time of the homicide trial, which involved none of the defendants in this case. Appellants Chew and Robinson argue that the district court should have granted the motions for a change of venue because the jury was prejudiced as a result of this publicity.

This is hardly a case such as *Irvin v. Doud*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), or *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), relied on by appellants. In both of those cases, the defendants themselves were subjected to a barrage of intensive and hostile news coverage. In *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the defendant's staged, highly emotional confession was filmed and then actually broadcast on television for three days.

This case falls far short of such examples. None of the publicity concerned the appellants' trial. All of the publicity occurred over one year prior to the trial. Chew and Robinson were mentioned in only one article dealing with the prior homicide trial, and then amidst the names of fifteen others. Although the fact was brought out at trial that young Mexican boys accompanied the defendants to the range, there was never a mention of the earlier deaths.

The Supreme Court recently observed in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976):

"Cases [where a fair trial is not received because of adverse publicity] are relatively rare, and we have held in other cases

---

1. Appellant Robinson's counsel concedes that no reversible error was committed at trial. He also waived oral argument. However, he submitted a brief substantially adopting the major arguments of appellant Chew.

that trials have been fair in spite of widespread publicity. * * * Taken together, these cases demonstrate that pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial. The capacity of the jury eventually impaneled to decide the case fairly is influenced by the tone and extent of the publicity, which is in part . . . shaped by what the attorneys, police, and other officials do to precipitate publicity." 427 U.S. at 554, 96 S.Ct. at 2800.

Here nothing was done or said to or by the press directly adverse to the defendants. ■ It follows, then, that the denial of a change of venue was not erroneous. *See United States v. Schwartzenberger*, 457 F.2d 380 (9 Cir. 1972); *Gawne v. United States*, 409 F.2d 1399 (9 Cir. 1969). Similarly, the trial court's refusal to give Chew's requested voir dire questions about the prior incident was not erroneous. The court asked the jurors generally whether they had heard about the case and received no affirmative reply. Any further probing might actually have been prejudicial to defendants. There was no abuse of discretion as to the scope of voir dire. *Cf. Haslam v. United States*, 431 F.2d 362, 364 (9 Cir. 1970), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

### Destruction of FBI Notes

Appellants Chew and Robinson argue that the destruction of the FBI notes violated their rights as established by the Jencks Act, 18 U.S.C. § 3500; *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and Rule 16 of the Federal Rules of Criminal Procedure. In *United States v. Harris*, 543 F.2d 1247 (9 Cir. 1976), this court held that even the good faith destruction of rough notes in accordance with normal FBI procedure is unjustifiable. The court stated:

"Notes taken by FBI agents in interviews either with prospective government witnesses or, as in this case, with the accused, constitute potentially discoverable materials. Since the routine disposal of potentially producible materials by the FBI amounts to a usurpation of the judicial function of determining what evidence must be produced in a criminal case, we hold that such original or rough interview notes must be preserved." at 1248 (citations omitted).

*Accord, United States v. Harrison*, 173 U.S. App.D.C. 260, 524 F.2d 421 (1975). The holding in *Harris* is controlling here.

However, the court in *Harris* found that the destruction of the rough interview notes was harmless error. It made it clear that the requirement of retaining the rough notes was prospective only. The FBI should not be sanctioned for failing to follow a rule not yet in force. This is particularly important since prior decisions of this and other circuits have indicated approval of the former FBI practice. *See, e. g., United States v. Pacheco*, 489 F.2d 554, 565–66 (5 Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975); *Wilke v. United States*, 422 F.2d 1298 (9 Cir. 1970). We therefore must inquire whether appellants were prejudiced by this practice in this case.

■ Appellants do not contend that the FBI agent misstated at trial what had been related to him during the interview with Hardin. The "302 Report" into which the notes were incorporated was read and accepted as accurate by Hardin. At most, appellants make a vague claim that their cross-examination of Hardin was impaired. We do not see how. We therefore conclude that no substantial rights of appellants were prejudiced by the destruction of the rough notes and that any error was harmless. *See United States v. Harris, supra* at 1252–1253; *United States v. Johnson*, 521 F.2d 1318, 1320 (9 Cir. 1975).

### Hardin's Testimony

Chew contends that the testimony of witness Hardin was received in violation of his rights under the Confrontation Clause. He bases this argument on the belief that Hardin's testimony did not fall into the co-conspirator hearsay exception and that the court erroneously curtailed his cross-examination of Hardin.

The law of this Circuit as to the co-conspirator exception was recently reiterated in *United States v. Calaway,* 524 F.2d 609 (9 Cir. 1975):

"The test governing admissibility of hearsay statements of coconspirators is whether there is substantial independent evidence, other than hearsay, which is sufficient to support a finding that the conspiracy existed and that the defendant against whom admission is sought was a party to the conspiracy. All that is required is enough to make a *prima facie* case; the evidence need not compel a finding beyond a reasonable doubt." 524 F.2d at 612 (citations omitted).

*See also United States v. Snow,* 521 F.2d 730, 733–34 (9 Cir. 1975). This test is met there.

■ Hardin saw Chew meet with other co-defendants on two occasions. She personally received instructions from him about the alibis the other defendants were to use. In addition, Hardin answered several telephone calls from Chew for Land. She was even present at Chew's smelter when the range-runner jeep was readied for use. Two government exhibits also linked Chew with the conspiracy. This evidence, taken together, meets the prima facie proof requirements.[2]

Chew's discussion of the reliability of Hardin's testimony is misplaced. Under Fed.R.Evid. 801(d)(2)(E), statements of co-conspirators are not considered hearsay. Rule 801(d)(2)(A) also excepts statements made by the defendant himself. Thus, the "high standards of reliability imposed on hearsay admissions" elaborated by Chew need not here be met. In any event, there is no indication that they were not.

■ The trial court curtailed Chew's counsel from cross-examination of Hardin, for which Chew claims error. Counsel was attempting to impeach Hardin's credibility by showing that she had used several different names during her life and that she failed to make the rental payments on a television set. This line of questioning seemed designed more to obfuscate the issues and confuse the jury than to reveal Hardin's disposition toward dishonesty.

Hardin had been married several times and used the names of her actual or meretricious spouses. Moreover, defaulting on credit payments hardly is a basis for impeachment as to truthfulness. The trial court was well within its discretion in limiting the scope of this cross-examination. *See United States v. Carrion,* 463 F.2d 704 (9 Cir. 1972).

### Reasonable Doubt Instructions

■ Appellants contend that the district court's instructions as to reasonable doubt were erroneous. They first argue that the use of the word "until" instead of "unless" in one part of the instruction suggests that the presumption of innocence may be dispelled by the government's evidence. However, this court has held that this wording is not prejudicial error. *See Compton v. United States,* 305 F.2d 119 (9 Cir. 1962).

The district court did err in its instruction defining reasonable doubt. It stated:

"In order that the evidence submitted shall afford proof beyond a reasonable doubt, it must be such as you would be *willing to act* upon in the most important and vital matters relating to your own affairs" (emphasis added).

The preferred instruction says that a reasonable doubt would make a person "hesitate to act." *See Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (criticizing the "willing to act" language).

The courts of appeals have consistently held that this language does not constitute reversible error. *See, e. g., United States v. Richardson,* 504 F.2d 357, 361 (9 Cir. 1974); *United States v. Emalfarb,* 484 F.2d 787, 790–91 (7 Cir. 1973). These courts also have exhorted their district judges to follow *Holland* and use the preferred "hesitate to act"

---

**2.** It follows that Hardin's testimony relates to statements and events during the pendency and in furtherance of the conspiracy.

language. We do the same. However, reversible error was not committed.

This court must review the instructions in their entirety. If the charge, taken as a whole, fairly and accurately conveys the meaning of reasonable doubt, then it is proper. *United States v. Petersen*, 513 F.2d 1133, 1136 (9 Cir. 1975). An examination of the charge in this case suggests that the concepts of presumed innocence, the government's burden of proof, and the nature of a reasonable doubt were communicated correctly to the jury. Accordingly, there was no prejudicial error.

*Sufficiency of the Evidence Against Green*

Appellant Green claims that there was insufficient evidence to convict him. An examination of the record reveals several references to Green as one of those who had contact with the other co-defendants. Hardin also testified that Green not only arranged to meet Land at the gunnery range, but that he was definitely involved in the conspiracy at the first. There is no evidence that Green ever received or stole the materials.

■ Based on the record alone, the case is a close one. However, the function of this court on appeal is to determine whether the verdict could have rationally been arrived at from the evidence beyond a reasonable doubt. *United States v. Turner*, 528 F.2d 143, 162 (9 Cir. 1975); *United States v. Nelson*, 419 F.2d 1237, 1242–43 (9 Cir. 1969). And the evidence must be viewed in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). From this perspective, the evidence was more than sufficient.

*Conclusion*

■ The judgments of the district court are AFFIRMED.[3]

3. We reiterate the holding of *Harris*, however, that the FBI must hereafter preserve the original notes taken by agents during interviews with prospective witnesses or with the accused.