**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Terry Lee RHODES, and Charles Dudley,**
**Defendants-Appellants.**

Nos. 82–1208, 82–1209.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 2, 1983.

Decided Aug. 16, 1983.

Certiorari Denied Dec. 5, 1983.

See 104 S.Ct. 535.

---

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

Richard E. Drooyan, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

W. Michael Mayock, Joseph F. Walsh, Los Angeles, Cal., for defendants-appellants.

Before ELY, SNEED, and TANG, Circuit Judges.

ELY, Circuit Judge:

This case involves two appeals from criminal convictions for conspiracy and possession of stolen mail in violation of 18 U.S.C. §§ 371 and 1708 (1976) respectively. We have jurisdiction under 28 U.S.C. §§ 1291 and 1294. Defendants-Appellants Charles Dudley and Terry Rhodes timely filed their Notices of Appeal on March 30, 1982. On the basis of the record and the applicable case law it is our conclusion that the convictions must be affirmed.

## FACTUAL BACKGROUND

On November 12, 1981, a federal grand jury indicted defendants Charles Dudley and Terry Rhodes along with seventeen other individuals for participating in a conspiracy to possess and distribute numerous checks which had been stolen from the mail in violation of 18 U.S.C. § 371 (1976). The indictment also charged Dudley with possession of stolen mail in violation of 18 U.S.C. § 1708 (1976). Dudley and Rhodes were arraigned before the Honorable Mariana R. Pfaelzer on November 23, 1981, and entered pleas of not guilty to the indictment.

On January 20, 1982, a federal grand jury returned superseding indictments against Dudley and Rhodes and the remaining defendants who had not pleaded guilty. The case was transferred to the Honorable Jesse W. Curtis and tried before a jury beginning on February 9, 1982. Thereafter, on March 1, 1982, the jury found Dudley and Rhodes guilty of conspiracy. In addition, Dudley was also convicted on two counts of possession of stolen mail.

On March 22, 1982, Dudley was sentenced to five years imprisonment on Count One and three years imprisonment on Counts Two and Three to run concurrently with the sentence imposed on Count One. On the same day Rhodes was sentenced to three years imprisonment on Count One.

## ANALYSIS

The following points of error are raised by the appellants Dudley and Rhodes.

 First, Dudley argues that the trial court erroneously excluded evidence of his entrapment by one Will Cunningham and erroneously refused to instruct the jury concerning the defense of entrapment. There are two prerequisites to the defense of entrapment: (1) the defendant must be induced by a government agent to commit the particular criminal act; and (2) the defendant must lack the predisposition to commit the act. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1974); *United States v. Jabara,* 618 F.2d 1319, 1328 (9th Cir.), *cert. denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980). A defendant is not entitled to have the issue of entrapment submitted to the jury in the absence of evidence showing some inducement by a government agent *and* a lack of predisposition by the defendant. *United States v. Glassel,* 488 F.2d 143 (9th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

 A review of the record demonstrates that there was insufficient evidence to satisfy either element of the entrapment defense. There was no evidence to indicate that Will Cunningham was acting as a government agent at the time he arranged the meeting between appellant Dudley and undercover postal inspectors, which resulted in Dudley's arrest. Cunningham, a bounty hunter, had an interest in sharing information with police officers concerning the whereabouts of fugitives he was seeking. With respect to his occupation, Cunningham on occasion exchanged information with police officers without receiving compensation. Such an interest does not, however, make him a government agent for purposes of this case. The record reveals that the conduct of Cunningham, at most, amounted to assistance in the commission of the crime, which is insufficient to show entrapment. *See United States v. Ratcliffe,* 550 F.2d 431, 434 (9th Cir.1976).

In addition, Dudley was not entitled to an entrapment instruction since there existed overwhelming evidence of his predisposition to participate in the conspiracy to possess and distribute stolen checks. In *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 (9th Cir.), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), this Circuit noted that "the most important factor ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." The evidence at trial established that apart from the transaction with Cunningham, Dudley engaged in numerous acts intended to further the objects of the conspiracy. These actions clearly show that Dudley was not reluctant to engage in criminal activity. For example, Dudley recruited government witness Lorraine Belloti to distribute stolen checks, he instructed her to open a fictitious bank account in the name Rosie Kendricks, he received stolen checks from government witness Eddie Lewis, he opened mail brought by co-defendant Terry Rhodes and removed checks, he laundered stolen checks through Larry Colbert, he attempted to sell stolen checks to Century Check Cashing, and he distributed stolen checks to Henry Basa. Thus, Dudley did not meet his preliminary burden of establishing that he was induced to commit the crime, and the prosecution established that he was predisposed to commit the crime. *See United States v. Diggs,* 649 F.2d 731, 739 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981); *United States v. Hermosillo-Nanez,* 545 F.2d 1230, 1232 (9th Cir.1976), *cert. denied,* 429 U.S. 1050, 97 S.Ct. 763, 50 L.Ed.2d 767 (1977).

 When the evidence presents no genuine dispute as to whether the defendant was entrapped, there is no factual issue for the jury, and the judge has a duty to rule on the defense as a matter of law. *United States v. Glaeser,* 550 F.2d 483, 487 (9th Cir.1977). In the circumstances of this case, there was no factual issue for the jury, and the trial court correctly ruled as a matter of law that Dudley was not entrapped.

Second, during the course of the Government's case, the trial court increased defendant Dudley's bond and remanded him to custody after Dudley engaged in conduct, which in the trial court's opinion, threatened to disrupt the orderly progress of the trial. Rule 46(b) of the Federal Rules of Criminal Procedure provides that a trial court may terminate a defendant's release on bail if necessary "to assure that his conduct will not obstruct the orderly and expeditious progress of the trial." *See Carbo v. United States,* 288 F.2d 282 (9th Cir. 1961).

From a review of the record we conclude that the trial court properly invoked its authority to prevent Dudley from interfering with the trial.

The trial court's action was taken following a particular incident. After the trial was adjourned one day for the noon recess, Dudley crossed over to the prosecution side of the courtroom and "said in a menacing voice that he didn't want [the prosecution] bringing any more people from the community in here, and he didn't want any more of this going on." He added "in a very menacing voice, 'I am going to clean this up when this [sic] all over.'" His statements were made in the presence of the prosecutor, several postal inspectors, and a witness who had just testified that Dudley looked "similar" to an individual who attempted to sell stolen California tax refund checks to Century Check Cashing. From the timing and content of his statements, it is quite apparent that Dudley was attempting to intimidate the prosecution and its witnesses.

The incident in court was not the first such attempt by Dudley to influence the Government. The court was advised that prior to trial Dudley told the prosecutor "that there was a lot more going on in this case than [the prosecutor] knew about. There were a lot of things he didn't like and he didn't want to get involved in, but that [the prosecutor] should watch [his] family." The court was also advised that a number of witnesses and a postal inspector had received threatening phone calls. These facts

and circumstances demonstrate that the trial court could reasonably believe that Dudley posed a real threat to the due administration of the trial.

In addition, Dudley claims that the trial court's action was improper because the court failed to hold a hearing to determine the validity of the Government's charge. A full hearing is not required so long as the trial judge states his reasons and gives defense counsel a chance to rebut the charges. *United States v. Stroud,* 474 F.2d 737 (9th Cir.), *cert. denied,* 412 U.S. 930, 93 S.Ct. 2759, 37 L.Ed.2d 157 (1973). In this case, the prosecutor advised the court of Dudley's conduct and identified the postal inspectors as additional witnesses to the incident. After Dudley's counsel answered the charges, the trial court remanded Dudley to custody because of the "threats" and because "Dudley [had] no right to cross the courtroom and approach these witnesses." The record demonstrates that the trial court was advised of all pertinent facts before deciding that Dudley's conduct justified revoking his bond.

Third, contrary to Dudley's assertion, the trial court never excluded his character witnesses from testifying. During the defense case, Dudley repeatedly asked to be released on bail and for a continuance of the trial, claiming that he was the only person who could locate certain witnesses. He also claimed that his release was necessary to allow him to prepare and present a defense because his attorney did not believe that these witnesses should be called. In response to Dudley's renewed request following the close of the defense case, the trial court asked Dudley for a proffer of the anticipated testimony of these witnesses. Thereafter, at a sidebar conference Dudley gave the trial court a list of witnesses. The list included the names of alleged character witnesses who knew Dudley but the nature of the specific testimony was not described.

The trial court took Dudley's motion for release under submission and then denied the motion the next day. The court stated: "I looked them all over and listened to your comments and I have ruled that their testi-

mony would not be relevant, and it would not be admissible." In commenting that the testimony was not admissible, the trial court was clearly not considering an objection by the Government to the proffered testimony, but was ruling on Dudley's request to be released on bail and for additional time to locate certain witnesses. Under these circumstances, the trial court's comments should not be construed as an exclusion of the testimony of character witnesses who were never subpoenaed and whose testimony was not objected to by the Government. In construing the court's statements, it should also be noted that the court did permit other defendants to call character witnesses. There is no reason to believe that the court would have excluded testimony by Dudley's character witnesses had they been called.

Fourth, during the course of the trial, the appellants repeatedly moved for a mistrial based upon various alleged errors. On appeal, appellants claim that it was reversible error for the trial court to deny the mistrial motions. These motions are discussed below:

■ A. During the course of his opening statement, defendant Jerome Strager's defense attorney represented that had his client been involved in a major conspiracy he would be out on bail and not in custody. One intimation which appellants' claim clearly resulted from this comment was that the remaining co-defendants at liberty had posted their bail with money they garnered from the conspiracy. Counsel for defendant Strager further stated that his client was the "white fly in the bowl of chocolate milk." Appellants contend that this statement clearly interjected the element of race into the trial since defendant Strager is white whereas almost all of the remaining defendants and the trial witnesses alleged to have participated in the conspiracy are black. Thereafter, the remaining defendants all moved for a mistrial on the basis of these remarks. The trial court felt that the implications of these statements were probably lost on the jury and denied the motions. The court then in-

structed the jury that the statements of counsel "are not evidence" and the jury should "disregard everything that counsel said except insofar as it may assist you in organizing the evidence that does come in."

The trial court properly denied the mistrial motions based on the opening statement. Counsel's remarks occurred at the outset of the trial which lasted over three weeks, there were no further references to Strager's bail status or his race, and the jury was admonished that it could not consider the attorney's remarks as evidence. An indication that the jury was not prejudiced against the other defendants as a result of the remarks is that one of the remaining defendants was acquitted and defendant Strager was convicted. *See United States v. Lutz,* 621 F.2d 940, 945 (9th Cir.1980), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1981) (jury verdict which differentiated between counts indicated that the court's instruction to view each defendant separately was sufficient to cure any prejudice from a joint trial); *United States v. Kaplan,* 554 F.2d 958, 967 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977) (failure to convict all defendants indicated that the jury was able to "separate the evidence as it pertains to each jointly tried defendant.").

■ B. During the cross-examination of government witness Peggy Basey, Ms. Basey volunteered the statement that a gunshot wound she received in April 1981 was related to the case. Outside of the presence of the jury, the prosecution informed the court that it had no evidence that any of the defendants on trial had threatened or attempted to harm Peggy Basey. The trial court then cautioned the jury that the volunteered statement "should not be admitted and is stricken and the jury must disregard it." The court added that the prosecution had represented that there was "no evidence of any alleged threats being connected with any defendant on trial in this case." Basey's testimony then continued, and the reference was not repeated.

Appellants' claim that the trial court should have granted a mistrial is without

merit in light of the trial court's admonition. *See Stoppelli v. United States,* 183 F.2d 391 (9th Cir.), *cert. denied,* 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631 (1950).

C. Prior to trial, Judge Pfaelzer ordered the Government to provide the defendants with copies of all witness statements by 9 a.m. on the Friday prior to trial. Pursuant to this order, the Government provided the five remaining defendants with copies of numerous witness statements. The Government omitted two memoranda of interviews of Lorraine Belloti prepared by postal inspectors and two handwritten statements prepared by Belloti herself. The memoranda were provided to defense counsel prior to Belloti's direct testimony, while the handwritten statements were discovered and produced during the cross-examination of Belloti.

The trial court initially denied the appellants' motion for a mistrial based upon the Government's failure to produce the memoranda of interviews prior to trial. Thereafter, following an evidentiary hearing, the court denied the motion for a mistrial based upon the failure to provide the handwritten statements. The court found that because of the volume of discovery, the Government's failure "was an excusable oversight which has occurred during a good faith effort on the part of the government to comply with the court's order." The court also noted that the material consisted of "a rambling, disconnected, almost unintelligible statement by a witness," and the defendants were not prejudiced by not having the document. To cure any possible prejudice, the court gave all the defense counsel an opportunity to use the statements to cross-examine Belloti, who was still on the stand, and offered them "a reasonable length of time to prepare cross-examination after examining it."

Under these circumstances, the trial court properly denied the appellants' mistrial motions. As to the interview memoranda, the Government complied with the Jencks Act, 18 U.S.C. § 3500, which governs the production of witness statements. *United States v. Jones,* 612 F.2d 453, 455 (9th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). As to the hand-written statements, the late production did not justify a mistrial where, as here, there was no prejudice to the defendants and no bad faith on the part of the Government. *United States v. Izzi,* 613 F.2d 1205, 1212–13 (1st Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 793 (1980); *United States v. Polizzi,* 500 F.2d 856 (9th Cir.1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 803, 42 L.Ed.2d 820 (1975).

Fifth, defendant Dudley contends that the trial court erroneously instructed the jury on two critical concepts: constructive possession and reasonable doubt. In analyzing these claims, this court must determine "whether the instruction, taken as a whole, was misleading or represented a statement inadequate to guide jury deliberations." *United States v. Grayson,* 597 F.2d 1225, 1230 (9th Cir.), *cert. denied,* 444 U.S. 873, 100 S.Ct. 153, 62 L.Ed.2d 99 (1979); *Stoker v. United States,* 587 F.2d 438, 440 (9th Cir.1978).

Because appellant Dudley was never proved to be in physical possession of any checks, the issue of constructive possession was fundamental to his conviction. The trial court instructed the jury on the concept of constructive possession as follows:

A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

\* \* \* \* \* \*

Ladies and gentlemen, sometimes this instruction is not clearly understood. I think an example is my wife and I have two automobiles. They are small, inexpensive model cars, but nevertheless we have two cars.

*My wife is driving in one car probably now,* and I have the other down in the garage. If my wife is driving her car, she is in actual possession of it. I am in constructive possession of it, because I

exercise dominion and control, with constructive possession in a joint capacity, because I have power and control over the automobile she is driving even though she is doing the actual driving.

So it is my car. I would have dominion and control subject to her agreeing, of course. She is in possession.

My car is in the garage down below. I am not in actual possession of it, but I am in constructive possession of it, because I intend to exercise control over it to the extent that I resist anybody taking it from me, I object to anybody doing anything to my car.

So, I have joint possession of my wife's car with her. She has actual possession, and we have, as I say, joint possession of that car, and I have constructive possession of my own car down in the garage. (Emphasis added.)

■ Dudley submits that the court's additional comments were incorrect statements of the law requiring reversal of his convictions. In *United States v. Cousins,* 427 F.2d 382, 384 (9th Cir.1970), this court stated that: "While [the] term 'constructive possession' is not free from ambiguity, it has been generally defined as *knowingly* having both the power and intention at a given time to exercise dominion or control over the property." (Emphasis added.) *See Rodella v. United States,* 286 F.2d 306, 311–12 (9th Cir.1960); *Cellino v. United States,* 276 F.2d 941 (9th Cir.1960).

Dudley argues that the phrase, "My wife is driving in one car *probably* now" implies that a defendant may be in constructive possession whether or not the defendant has knowledge that another person has actual possession of the item. Dudley concludes that this example violates the *Cousins* definition since it confuses the knowledge requirement.

In our opinion, the use of the word "probably" in the instruction did not violate the *Cousins* definition. It merely referred to the likelihood that the trial judge's wife was in actual, as opposed to constructive, possession of the car. Since possession can be exercised jointly, the judge's construc-

tive possession of their vehicle did not depend on the character of his wife's possession. Indeed, an individual may have joint constructive possession whether or not he has knowledge that another has actual possession of the item as long as he knows that the other person has actual or constructive possession.

In addition, appellants jointly urge reversal of their convictions on the ground that the court erred in instructing the jury on the concept of "reasonable doubt." The instruction given by the trial court reads as follows:

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person *hesitate to act.* Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not *hesitate to rely and act* upon it in the most important of his own affairs.

Ladies and gentlemen, at this point I think perhaps some discussion of the word "hesitate" should be made to you. Webster gives two definitions or several definitions of "hesitate."

One is to pause. This, of course, suggests the passage of time. The other is to be reluctant in decision, to be doubtful.

So, the word "hesitate" as used in these instructions should be used with the latter interpretation. It is not important how long it takes you to reach a decision. The important thing is that when you do reach a decision, that you are comfortable with it and that you feel that the decision is the right one. So, that is what is meant by "hesitate." (Emphasis added.)

■ The defendant in a criminal case has a constitutional right to have the jury adequately instructed on the concepts of the presumption of innocence and proof beyond a reasonable doubt. *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). In reviewing the language used in defining reasonable doubt, special attention has been focused upon the words "hesita-

tion to act." The courts have stated that it is error to substitute the concept of "willingness to act" for the more appropriate term of "hesitation to act." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954); *see United States v. Clabaugh*, 589 F.2d 1019, 1022 (9th Cir.1979); *United States v. Robinson*, 546 F.2d 309, 313–14 (9th Cir.1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 597 (1977).

Dudley argues that the added explanation of reasonable doubt had a tendency to transform the instruction into the erroneous "willingness to act" type of instruction. Dudley also argues that the instruction suggests that the test of reasonable doubt is whether the jury is comfortable with its verdict.

Taken as a whole, the trial court's definition of reasonable doubt did not have the effect of instructing the jurors that they must be "willing to act" on the evidence. In addition, the court's instruction that the jury should be "comfortable with its decision" was surely made in the context of telling the jurors that they should not be concerned with "how long" they might take to reach a decision.

■ Even if the court's language had a tendency to transform the instruction into a "willingness to act" instruction, it was not reversible error in this instance. As noted by this court in *United States v. Robinson*, 546 F.2d at 313, "[t]he courts of appeals have consistently held that [the willingness to act] language does not constitute reversible error." The test is whether "the instructions as a whole, fairly and accurately convey the meaning of reasonable doubt." *United States v. Clabaugh*, 589 F.2d at 1022. *See United States v. Richardson*, 504 F.2d 357, 361 (5th Cir.1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1406, 43 L.Ed.2d 659 (1975); *United States v. Emalfarb*, 484 F.2d 787, 790–91 (7th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). It is our view that the instant jury instruction taken as a whole met the *Clabaugh* and *Robinson* tests. *See United States v. Petersen*, 513 F.2d 1133, 1136 (9th Cir.1975).

■ Sixth, on April 8, 1981, at approximately 7:30 p.m. Dudley was arrested after he attempted to sell $700,000 worth of stolen checks to postal inspectors acting in an undercover capacity. After Dudley denied any knowledge of or association with the car he was seen driving shortly before his arrest, the postal inspectors removed and secured the vehicle. The next day, the postal inspectors obtained a search warrant for an attache case and certain notebooks visible inside the car. Thereafter, they searched the car and seized the items described in the warrant as well as $200,000 worth of stolen checks in the trunk. The notebooks seized from the car contained references to numerous accounts used to launder checks while nothing of significance was found in the attache case. On April 10th the car was returned to Dudley along with a copy of the warrant.

Dudley's claim that "nothing in the affidavit ... focused any reasonable suspicion upon ... the notebooks" which is his only basis for attacking the warrant, is without merit. The affidavit explicitly stated that during the undercover negotiations Dudley made "handwritten notes in a black notebook to meet on April 8, 1981, in room number 1735." The affidavit also disclosed that on several occasions Dudley actively engaged in negotiations concerning stolen checks with undercover Postal Inspector Fail. Thus, it was reasonable for the postal inspectors to conclude that the notebooks in the car would contain references to these negotiations as well as an explicit reference to the April 8th meeting. For these reasons there existed probable cause to support the issuance of the search warrant for the notebooks.

Seventh, co-defendant Eddie Lewis, who entered a guilty plea, attended the trial proceedings and during a recess stated in the hallway outside the courtroom in the presence of Mr. Abubakari, co-defendant Dudley's attorney, that appellant Rhodes was not the source of the stolen checks. Lewis later was hospitalized after suffering a heart attack and did not testify concerning the matter. Appellant Rhodes sought

to have Mr. Abubakari testify about the statement of Lewis. After the court was advised that Lewis would plead the Fifth Amendment and not testify, the court ruled that the testimony of Lewis was unavailable and that the statement made to Mr. Abubakari was not admissible under Federal Rule of Evidence 804(b)(3).

Federal Rule of Evidence 804(a)(4) defines unavailability of a witness to include situations in which the declarant "is unable to be present or testify at the hearing because of death or an existing physical or mental illness or infirmity." The trial court correctly ruled that Lewis was unavailable to testify in light of his heart attack. Given Lewis' unavailability, Rhodes contends that under Federal Rule of Evidence 804(b)(3) the statement to Abubakari by Lewis fell within the hearsay exception of a statement against interest and, accordingly, should have been admitted.

Federal Rule of Evidence 804(b)(3) reads as follows:

A statement which was at the time of its making so far contrary to the *declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability,* or to render invalid a claim by him against another, that a reasonable man in his position would have not made the statement unless he believed it to be true. A statement intending to expose a declarant to criminal liability and offered to exculpate the accused is not admissible unless *corroborating circumstances clearly indicate* the trustworthiness of the statement. (Emphasis added.)

Contrary to Rhodes' assertion, the statement was not against Lewis' penal interests. Lewis had already pleaded guilty to participating in a conspiracy involving the stolen checks. Furthermore, at the time he made the statement, Lewis was not subject to additional criminal liability since the Government agreed to dismiss all remaining charges pursuant to a plea agreement.

▮ In reviewing these facts, we note that the determination of the admissibility of a statement under Rule 804(b)(3) is committed to the sound discretion of the trial court, *United States v. Satterfield,* 572 F.2d 687, 693 (9th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978), and on appeal, that determination should not be disturbed absent an abuse of discretion. *United States v. Poland,* 659 F.2d 884 (9th Cir.), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981). Accordingly, after a careful review of the record, we conclude that the trial court did not abuse its discretion with respect to the first test under Rule 804(b)(3).

▮ With respect to the second test under Rule 804(b)(3), any statement sought to be admitted must satisfy the corroborating circumstances requirement. Under the rule, "the corroborating circumstances must do more than tend to indicate the trustworthiness of the statement; they must clearly indicate it." *United States v. Satterfield,* 572 F.2d at 693. Thus, "if a reasonable view of the evidence supports the trial court's finding that such a statement is not reliable, the finding must be sustained on appeal." *United States v. L'Hoste,* 640 F.2d 693, 696 (5th Cir.1981).

▮ The corroborating circumstances in this case do not "clearly indicate" the trustworthiness of the statement. Indeed, the surrounding circumstances indicate that the statement was unreliable. The statement was made after Lewis' plea of guilty; it did not concern additional criminal liability; it was not made until the actual trial of this case; it was made to an attorney for the benefit of a co-conspirator; Lewis became unavailable because he decided to assert his Fifth Amendment right against self-incrimination after he made the statement to the attorney and Lewis had previously made statements which were inconsistent with Rhodes' offer of proof in court. Under these circumstances, the trial court did not abuse its discretion in holding that Lewis' statement did not meet the second test under Rule 804(b)(3). *See United States v. Poland,* 659 F.2d at 895; *United States v. Palumbo,* 639 F.2d 123, 131 (3rd Cir.), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Bagley,*

537 F.2d 162, 165 (5th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977).

Eighth, Rhodes challenges his conviction on sufficiency of the evidence grounds. In reviewing the sufficiency of the evidence, this court must view the evidence in the light most favorable to the Government. *United States v. Francisco,* 536 F.2d 1293 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 312 (1976). Furthermore, any reasonable inference drawn from the evidence must also be viewed in this light. *United States v. McDonald,* 576 F.2d 1350, 1358 (9th Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978); *United States v. Freie,* 545 F.2d 1217 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977). On appeal, this court must determine whether the evidence introduced at trial was sufficient to permit a "rational trier of fact ... [to] find the essential elements of the crime beyond a reasonable doubt." *United States v. Witt,* 648 F.2d 608, 611 (9th Cir.1981); *see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

A. Viewing the evidence in the proper light, we conclude that there was sufficient evidence to establish that Rhodes participated in the *conspiracy to possess and distribute stolen checks.* A review of the record yields the following:

Co-defendant Peggy Basey testified that on one occasion she saw Rhodes with a box of mail in her apartment, that the box was opened and "Charley [Dudley] and Eddie [Lewis] and Terry [Rhodes] began opening the mail." Government witness Lorraine Belloti testified that she also saw the box of mail and that several people, including Terry Rhodes, "were pulling the checks out that they wanted to keep ... [and] were passing the checks to me ...." The record also reveals: On several occasions, Rhodes gave checks to Lewis; Lewis gave Rhodes one hundred dollars and told him that it was "money from a check that had been cashed"; Lewis told Rhodes that there would be more money once they got it "from the accounts"; Dudley told Colbert that the checks came from the post office; Dudley told Cunningham that he had a friend in the post office; all of the stolen checks passed through the World Way Post Office where Rhodes was employed; Rhodes had access to all areas of World Way and he could leave the facility without attracting attention; and Rhodes' phone number and the identification "Terry, mail" were discovered on a list of phone numbers written by Lewis.

On these bases the jury's finding that Rhodes participated in a conspiracy to possess and distribute stolen checks is supported by sufficient evidence.

B. Contrary to Rhodes' view, the record also contains sufficient evidence to establish that the checks were *stolen from the mail.* Evidence in support of this finding includes the following:

There is no dispute that the checks were actually mailed since the parties stipulated that the checks were placed in the mail. Moreover, two witnesses saw a large box of mail which contained checks in envelopes; it was the usual practice of the California Controller's Office to mail out checks; and the records of the Controller's Office indicated that the 466 state income tax refund checks introduced into evidence were mailed on the dates of the checks.

In establishing this type of theft, the prosecution is not required to introduce "direct proof of theft or taking from the mails .... [I]t is sufficient that the government show that the materials were mailed, that the addressees never received them and the materials were later in possession of a person who misused them." *United States v. Hall,* 632 F.2d 500 (5th Cir.1980); *United States v. Indelicato,* 611 F.2d 376, 381 (1st Cir.1979). From a review of the record, we hold that the Government has met this burden.

There is also sufficient evidence to demonstrate that the checks were stolen from the mail rather than from the intended recipients after the checks were delivered. The parties stipulated that all of the 841 checks introduced into evidence were mailed and none of them were received by the intended recipients. It would be an

extraordinary coincidence if all 841 checks were stolen after delivery but before they were received by the intended recipients. Such a coincidence is even less likely given the circumstances that many of the checks were mailed by companies in Los Angeles and were payable to recipients outside of Los Angeles. Unless the checks were stolen from the mail, the participants in the conspiracy would have had to steal the checks after delivery but before receipt by the intended recipients in numerous areas throughout the United States. On this basis there was sufficient evidence to establish that the checks were stolen from the mail.

■ C. Finally, there is sufficient evidence to support the inferences contained in the jury instruction regarding the theft of the checks from the mail.

The Government's Instruction No. 54 read:

> The Government has presented evidence which, if believed by you, indicates that various pieces of mail and the contents thereof were placed in the United States mail and never received by the addressee thereof. You may infer from this evidence that said mail and the contents thereof were stolen while in the custody of the United States Post Office.

Rhodes submits that the Government's Instruction No. 54 represented that proof of mail theft from the post office required merely a showing that various pieces of mail were placed in the mails and never received by the addressees. Rhodes argues that because the evidence consisted of only checks separated from the envelopes in which they were purportedly mailed, it was incumbent on the prosecution to show in some fashion that the unseen envelopes for these checks had indeed been properly posted and properly addressed. After objecting to the Government's instructions, Rhodes offered two alternate instructions. Proposed Instruction No. 1 declared in pertinent part, "you may infer that mail has been stolen if the evidence demonstrated that it was duly placed in the United States mail and was never received by the addressee or other authorized receiver." Rhodes'

Proposed Instruction No. 2 stated "an item is duly placed in the United States mail if it is properly addressed and bears proper postage." The trial court ruled it would not give either of Rhodes' proposed jury instructions.

The Government answers by stating that the entire line of reasoning is moot given the stipulation the two parties entered concerning this matter. It was stipulated that the items stolen from the mail "were placed in an authorized depository for mail on or about the date of the item and were never received by the intended-recipient." The Government clearly has the better argument. The defendants most certainly agreed to the stipulation knowing that it was the intention of the Government to satisfy the conditions of the mailing requirement. *See United States v. Indelicato*, 611 F.2d at 381; *United States v. Hall*, 632 F.2d at 501–03.

In addition, the instruction is proper given the number of checks involved. As noted above, it is only reasonable to infer that the 841 checks were stolen from the mail rather than after delivery to the intended recipients. Indeed, a realistic alternative explanation such as theft from the recipients themselves does not exist. Finally, the stipulation itself appears unambiguous on its face.

■ Assuming, *arguendo,* that the instruction was not proper, any resulting error was harmless. A conviction will be reversed as a result of a nonconstitutional error only if it is "more probable than not" that the error "materially affected the verdict." *United States v. Valle-Valdez,* 554 F.2d 911, 916 (9th Cir.1977); *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Dixon,* 562 F.2d 1138 (9th Cir.1977), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978); *United States v. Awkard,* 597 F.2d 667, 671 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979). The giving of an erroneous jury instruction is a nonconstitutional error which is measured by the "more probable than not" standard. *United States v. Valle-Valdez,* 554 F.2d at 916.

The nature of the instruction itself rendered any error harmless. The determination of whether the checks were stolen from the mail was left entirely to the jury. The instruction merely informed the jurors that they could draw certain inferences; it did not instruct them that they had to do so. In addition, as noted above, sufficient independent evidence existed from which the jury could find that the checks were stolen from the mail. In other words, the jury did not have to rely solely on the inferences presented in the challenged instruction to conclude that the checks were stolen from the mail. The trial itself was replete with evidence which could certainly lead a rational finder of fact to the virtually inescapable conclusion that such thefts occurred. For these reasons, we hold that the questioned jury instruction complied with all the requirements set forth in *Valle-Valdez.*

For the reasons stated above, the appellants' convictions are

AFFIRMED.